# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs July 21, 2010

## THOMAS M. GOSS v. STATE OF TENNESSEE

**Direct Appeal from the Circuit Court for Moore County**
**No. 951     Robert Crigler, Judge**

---

**No. M2009-02628-CCA-R3-PC - Filed November 24, 2010**

---

A Moore County jury convicted the Petitioner, Thomas M. Goss, of one count of rape and one count of aggravated burglary, and the trial court sentenced him to an effective sentence of twelve years in the Tennessee Department of Correction. The Petitioner filed a petition for post-conviction relief, claiming that he received the ineffective assistance of counsel. After a hearing, the post-conviction court denied relief, and the Petitioner now appeals. After a thorough review of the record and applicable law, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which JERRY L. SMITH and ALAN E. GLENN, JJ., joined.

S. Craig Moore, Fayetteville, Tennessee, for the Appellant, Thomas M. Goss.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; Charles F. Crawford, Jr., District Attorney General; Hollynn L. Eubanks, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION
### I. Facts
### A. At Trial

A Moore County jury convicted the Petitioner of rape and aggravated burglary. On direct appeal, this Court summarized the underlying facts of the case as follows:

> Rachel Carter, the victim's mother, testified that she lived with her

daughter, B.V.[1]; her son, Jeremiah Buchanan; her daughter, Shekara Buchanan; her baby, Erikk Cole; her stepson, Kahmariez Ridley; and her fiancé, Erikk Cole. Carter said B.V. slept in a bedroom by the "wash room." On March 2, 2006, she heard a "truck start up" and "s[aw] [the Petitioner's] truck leaving out of [her] driveway." Carter said she knew the truck belonged to the Petitioner because she had seen it before. As the truck was leaving, B.V. came to Carter saying, "Mama . . . he touched me," identifying the Petitioner as the perpetrator. On cross-examination, Carter testified that B.V. was thirteen years old when this happened. On redirect, Carter admitted that when she saw the truck driving away, it was about twenty-five feet away and in the dark.

Officer Robin Holt, an officer with the Moore County Sheriff's Department, testified that she went to the Petitioner's house on March 2, 2006. When she arrived there, the Petitioner and his girlfriend were intoxicated and on the roof of the porch.

Officer Darren Harrison, an officer with the Moore County Sheriff's Department, stated that he went to B.V.'s house for a reported burglary. He testified that the screen by B.V.'s bedroom was "displaced, but it was not on the ground." In addition, there was a shoe print on the outside wall of the house. Officer Harrison said that after listening to B.V.'s story, he drove to the Petitioner's house, where he saw the Petitioner's white pick-up truck. He stated that the Petitioner and his girlfriend were quite drunk, and he found the pair of them on the porch's roof. On cross-examination, Officer Harrison said the shoe print was only a partial, so it was never compared with the Petitioner's shoe.

Officer Chad Holt, an officer with the Moore County Sheriff's Department, testified that he went to B.V.'s house in response to a burglary report. He investigated the point of entry and the footprint, but he did not find any fingerprints. Holt stated that B.V. named the Petitioner as her attacker and described his truck. When Holt went to the Petitioner's residence, he felt the hood of the Petitioner's truck, finding it warm from recent use.

B.V. testified that she lived with her mother, step-dad, sister, and three brothers when these events happened. B.V. said she shared her bedroom with her little sister and her little brother. Recounting the events of March 2, 2006,

---

[1] We will refer to the victim in this case by her initials due to the nature of the crime and the victim's age.

B.V. said she was sleeping and she woke when she "felt something enter [her] vagina." She was wearing a pair of shorts and a tee-shirt. She said she sat up in bed and "pulled the covers over [herself]," and she saw someone on her bed. B.V. said the man identified himself using either the name Timothy or Thomas, and he said that he did not know what he was doing in her house. B.V. stated that she told the man to leave, at which point he shone the flashlight onto his own face, so she could see who he was, and then he admitted being drunk and left her house. B.V. said that when he put the flashlight to his face, she recognized the man as one of her step-father's friends, and he was the Petitioner. B.V. said the Petitioner had previously been to her house "probably about two or three times." She said that she did not hear him enter the house, but heard him leave via the laundry room window. When questioned about the touching, B.V. said that the Petitioner was using his finger to touch the inside of her vagina, and that she "believe[d]" he touched her under her clothing. She testified that once the Petitioner left, she "ran to [her] mama" and told her what happened.

On cross-examination, B.V. said she was thirteen years old on March 2, 2006, when this touching occurred. She said that, while the Petitioner had been to her family's house several times, she never had a conversation with him. B.V. stated that she was wearing panties under her shorts, which came to about three inches above her knee and had a stretchy waistband. She said she was lying on her stomach in the bed and her little brother was close to her in bed. B.V. testified that "[she] didn't feel [any]thing until the hand entered [her] vagina and then that's when[] [she] woke up." B.V. stated that when she asked the Petitioner to leave, she "said [it] in [her] normal voice" and did not scream or yell. She said neither her little brother nor sister ever woke up during the incident. B.V. said when she ran to her mother's room, her mother was standing at the window watching the Petitioner's pick up truck drive away. When she entered her mother's room, B.V. heard the Petitioner's loud truck. On redirect, B.V. again asserted that the Petitioner's finger "was inside of [her]."

Sheriff Mark Logan, Sheriff of Moore County, testified that he took pictures of the window by B.V.'s bedroom. He said the window was a three-sectioned window, with only the two outside, smaller sections able to move. He said the window was eighty-three inches wide and forty-six inches high, and the sill was sixty three inches above the ground. The side panels of the window were each nineteen and a half inches wide. On cross-examination, Sheriff Logan testified that one side panel still had its screen, but the other panel's screen was off of it. He stated the police tested the screen for fingerprinting.

*State v. Thomas Matthew Goss*, No. M2007-00937-CCA-R3-CD, 2008 WL 343126, at *1-2 (Tenn. Crim. App., at Nashville, Feb. 4, 2008), *perm. app. denied* (Tenn. Aug. 25, 2008). At a subsequent sentencing hearing, the trial court sentenced the Defendant to twelve-years for the rape conviction and six-years for the aggravated burglary conviction and ordered the sentences to run concurrently, for a total effective sentence of twelve years.

## B. Post-Conviction Hearing

The Petitioner filed a petition for post-conviction relief claiming that he received the ineffective assistance of counsel. The post-conviction court held an evidentiary hearing wherein the following evidence was introduced: The Petitioner's attorney ("Counsel"), testified that he had been an assistant public defender for ten years at the time of the post-conviction hearing. Prior to his employment with the public defender's office, Counsel was in private practice, and seventy percent of his work was related to criminal law. Counsel testified that he had done "hundreds" of jury trials during his career. Counsel recalled that another attorney, ("Co-Counsel"), and two investigators assisted him with this case.

Counsel testified that, during his representation of the Petitioner, he received information that the victim may have made prior false claims of sexual assault. Counsel described the information as "rumors" that he was unable to confirm. He tried to verify these "rumors" through the District Attorney's office, the court file, and the Sheriff's Department. Because he could find nothing to verify this information, he did not raise this issue at trial. Counsel said that, even had he been able to confirm the information, he and Co-Counsel still would have had to bypass the Rape Shield Statute in order to get the information in at trial.

Counsel testified that selecting a jury in Moore County can be challenging for defense counsel because Moore County is a small county. Counsel said, "Everybody knows everybody else. Everybody knows where everybody is living. Quite candidly, everybody knows a little bit about everybody else's business." Counsel, speaking generally of jury selection, said, "If there are 30 jurors, defense counsel probably has a problem with 25 of them."

Counsel recalled that, during voir dire, a juror said his stepsister was a victim of sexual assault. Upon further questioning, the juror said that he did not know much about the incident and that it would not affect his ability to be fair and impartial. This juror was ultimately selected for the jury panel. Counsel did not recall whether he discussed with the Petitioner whether to strike this juror but said that the Petitioner was present and heard all of the questions to and responses from the potential jurors.

Counsel also recalled another juror who, during voir dire, acknowledged that he had known Sheriff Logan, a witness in the case, "for years." When asked whether Counsel recalled discussing with the Petitioner whether to strike this juror, Counsel responded:

If I remember him specifically, no. I always tell my clients at jury selection, explain to them the purpose of jury selection–I explain to them the challenges we have, and I explain to them that we can throw people off, basically, for the simple reason we don't like the way they look, but we have to have a race neutral basis. I tell that to all my clients.

I tell them that they are part of the jury selection, just like I am. . . . And if there is somebody on there that he just doesn't want, let me know and we will talk about it or discuss it.

My policy has always been if there is a disagreement between me and my client about a juror, I strike them. So I do not remember any specific conversations with regard to striking [the juror]. And I believe his answers . . . are not answers that would have warranted challenging him for cause.

Counsel assumed that the juror who had known Sheriff Logan for a long time remained on the jury.

Counsel recalled that, during the trial, he did not object to Officer Robin Hold's reference to the community where the Petitioner lived as "The Farm." Counsel said that he understood "The Farm" to be a Hare Krishna community located in Mulberry. Apart from this reference to the Petitioner's living on Hare Krishna property, the State introduced no evidence that the Petitioner was a Hare Krishna follower. Counsel did not recall the Petitioner asking him to move for a change of venue but said that, had the Petitioner done so, he would have told the Petitioner that insufficient publicity surrounded the case to warrant bringing a jury from another county to Moore County.

Counsel testified that the local Moore County newspaper is not published daily and that there are no local television stations. Counsel was unaware of any media coverage of this criminal incident. Counsel recalled that during voir dire, based upon the questions asked, the potential jurors seemed to have no knowledge of the Petitioner's case. Based upon this, Counsel believed that he did not have a good faith basis upon which to move for change of venue.

Counsel recalled that the State introduced a photograph of the victim's window, which showed that the window screen had been removed and that there was a ladder beneath the window. Counsel testified that, at the time of the alleged crime, the screen was not completely removed from the window and there was no ladder below the window. Counsel said that a police officer testified during the trial that the police officer had removed the screen from the window and placed the ladder below the window. Counsel explained that he did not object to the picture because the State's theory was that the Petitioner entered the house through the screened window and the defense's response was that, based on the size of

the space, the Petitioner would not have been able to crawl through that screened window. Counsel testified that he wanted the jury to see the picture because it evidenced how narrow the screen and window were, which supported the defense's argument that the Petitioner could not have fit through the screened window. Counsel said, "[W]e had no intentions of objecting to [the photograph], because of the dimensions of the screen and the height of the bottom of the window from the ground."

Counsel testified that neither he nor Co-Counsel saw anyone make a gesture to any juror and that the Petitioner never reported seeing such a gesture. He said that, had such a gesture been brought to his attention, he would have asked for a mistrial and for the trial court to hold the police officer in contempt of court.

Counsel testified that, at the time of the Petitioner's arrest, the Petitioner was living with a woman, Ms. Bowers, who was present during the arrest. Counsel spoke with Ms. Bowers on several occasions and learned that the Petitioner and Ms. Bowers had been together the night of the alleged crime. After reading the statement she gave to police, however, he decided not to call Ms. Bowers as a witness. In this statement, Ms. Bowers indicated that she and the Petitioner became intoxicated the night of this incident, she woke up after she and the Petitioner returned to their house and saw the Petitioner standing in the bedroom dressed in clothes and boots. Ms. Bowers' statement indicated that she did not know when he got up or when he put on the boots. Counsel spoke with Ms. Bowers about the statement, and she confirmed it was true. Counsel told the Petitioner Ms. Bowers' testimony would hurt the Petitioner's case, and together they agreed not to call Ms. Bowers as a witness.

Asked if he thought the Petitioner received the effective assistance of counsel, Counsel responded that, when they went to trial, Counsel knew both the proof that would be presented and the problems with the case. He then recounted the weaknesses of the State's proof at trial and said:

> I have tried a lot of cases in my life. And probably only two cases have I tried that I felt the jury was incorrect and this is one of them. And I still feel that.

> So if you ask [was] I ineffective? I think I was prepared, more than prepared. There were no surprises. Everything that I knew prior to trial came true at trial.

> But, obviously, I didn't do something well, because the jury returned a verdict of guilty to [the Petitioner]. So if that answers that question, that is the best way I know to say it.

On recross examination, Counsel testified that, in preparation for this trial, he

conducted the preliminary hearing, prepared a transcript of the preliminary hearing and reviewed it with investigators, spoke with Sheriff Logan on multiple occasions, went to the victim's home, went to the Petitioner's residence, interviewed all the witnesses willing to speak with Counsel, and identified potential issues at trial.

The Petitioner testified that, during jury selection, a juror indicated his stepsister was a victim of a sexual crime. The Petitioner thought he told Counsel that this potential juror would not be good for the panel. The Petitioner did not remember Counsel's response and said that "at the end of the jury, we only had a few more people to choose from, maybe two people to choose from. And somehow, he slipped in."

The Petitioner also recalled that another juror, with whom the Petitioner had worked at the Jack Daniel's bottling plant, said he had known Sheriff Logan for many years. The Petitioner testified that he did not think he wanted that juror on the panel but that he could not remember whether he told Counsel such. This juror was selected for the panel.

The Petitioner testified that he expressed concern to Counsel that Sheriff Logan might have ulterior motives. The Petitioner explained:

> The sheriff had known members of my family, known my sister and I believe he might have met my brother at a time. And, you know, I am not sure, I am not sure of what depth he was acquainted with my sister at. But I just–I didn't believe it was good. Not for me at least.

The Petitioner said that he and Sheriff Logan had a conversation in jail, which he described as a "conflict," and that he told Counsel about the conversation. Counsel told the Petitioner that they would not bring up this conversation unless "we absolutely have to," and it was not raised at trial.

The Petitioner testified that he was a practicing Hare Krishna and was living in the Hare Krishna Christian community in Mulberry. The Petitioner said that "a lot of animosity in the surrounding community" existed toward the Hare Krishna community. The Petitioner explained that he knew this because he lived in the surrounding community before moving to the Hare Krishna community. The Petitioner said that he told Counsel he wanted a change of venue given the community's small size. Counsel told the Petitioner that a change of venue "[wasn't] going to happen" and that the possibility of a change of venue was "very nil."

The Petitioner testified that he saw Detective Daren Harrison make a sexual hand gesture to the jury. The Petitioner recalled that the detective was sitting at counsel's table for the State during the victim's testimony. He said that, as the victim testified, the Detective "reached over and caressed the wood handle, or the wood arm, on the chair and looked at [a juror] and nodded at [the juror] and nodded toward me, as if I was getting some kind of

gratification out of the [victim's] testifying." The Petitioner thought he mentioned "something about it" to Counsel, but no one else saw it.

The Petitioner testified that he and Melissa Bowers, his fiancée, were together at a friend's house the night of the alleged crime. The Petitioner recalled that they left the friend's house at about 11:30 p.m. and drove home. The Petitioner said that he told Counsel he wanted Bowers to testify even though she was drunk the night of the criminal incident and the prosecutor would "tear her testimony to pieces." The Petitioner explained that he wanted Bowers to testify because she was his alibi. The Petitioner said his and Counsel's general strategy was to not "put a lot of defense up" at trial because the burden of proof was on the State, and they believed that the lack of evidence in his case would preclude a conviction.

On cross-examination, the Petitioner agreed that Counsel put "an awful lot of effort" into the Petitioner's case. The Petitioner also agreed that he had two prior convictions for aggravated assault and burglary.

At the conclusion of the hearing, the post-conviction court denied post-conviction relief. It is from this judgment that the Petitioner now appeals.

## II. Analysis

On appeal, the Petitioner asserts that Counsel failed to provide effective assistance. He raises seven specific objections to Counsel's trial representation: (1) his failure to strike several members from the jury; (2) his failure to file a motion to change venue; (3) his failure to object to Detective Harrison's hand gesture to the jury; (4) his failure to call Ms. Bowers as an alibi witness; (5) his failure to attack Sheriff Logan's credibility at trial; (6) his failure to object to the misleading photograph of the victim's window; and (7) his failure to introduce evidence of the victim's prior false accusation of sexual abuse. The State responds that the Petitioner has failed to prove any of his allegations that Counsel was ineffective.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2006). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2006). Upon our review, the trial judge's findings of fact are given the effect and weight of a jury verdict, and this Court is "bound by the trial judge's findings of fact unless we conclude that the evidence contained in the record preponderates against the judgment entered in the cause." *Black v. State*, 794 S.W.2d 752, 755 (Tenn. Crim. App. 1990). Thus, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony and the factual issues raised by the evidence are to be resolved by the trial court judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999); *Henley v. State*, 960 S.W.2d 572, 578-79

(Tenn. 1997). A post-conviction court's conclusions of law, however, are subject to a purely de novo review by this Court, with no presumption of correctness. *Fields v. State*, 40 S.W.3d 450, 457 (Tenn. 2001).

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Strickland*, 466 U.S. at 688).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland*, 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. *Strickland*, 466 U.S. at 690; *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483

U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). The fact that a particular strategy or tactic failed or hurt the defense does not, standing alone, establish unreasonable representation. *House*, 44 S.W.3d at 515 (citing *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)). However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation. *House*, 44 S.W.3d at 515.

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994).

We note that, during the post-conviction hearing, Counsel was asked if he provided effective assistance, and Counsel responded that "he didn't do something well" because the jury returned a guilty verdict. A verdict of guilt, in and of itself, is not an indication of whether the legal representation during a trial was ineffective. A trial attorney can render excellent representation, yet in light of the facts and the State's evidence, the jury may still render a guilty verdict.

## A. Jury Selection

The Petitioner asserts that Counsel failed to challenge a juror whose stepsister was a victim of a sexual crime and another juror who had known Sheriff Logan for many years. Both of these jurors were selected for the Petitioner's jury panel, despite the Petitioner indicating to Counsel that he did not want them on the panel. The post-conviction court found that the Petitioner failed to show how either juror affected the outcome of his trial. The post-conviction court also found that the juror responses did not contain a basis upon which to challenge the jurors for cause.

Our review of the record supports the post-conviction court's findings. The transcript of the voir dire indicates a juror responded that, approximately a year before, his stepsister was a victim of a sexual crime. The juror did not know whether the case was prosecuted. The juror stated, "I don't know, I just know that my sister, stepsister and somebody. I don't even–you know, there's no detail." When asked if this would affect his ability to decide this case, the juror responded, "No, sir."

As to the other juror at issue, the voir dire transcript indicates that, when the potential

jurors were asked if they knew Sheriff Logan, the juror the Petitioner now challenges responded, "I've known him for years." When asked if that would affect his ability to listen to the proof and make a decision based on the proof, the juror responded, "No."

We agree with the post-conviction court's findings that these responses presented an inadequate basis upon which to challenge the jurors for cause. Further, Counsel testified that it was his policy to defer to defendants and strike jurors if a defendant requested it. Counsel did not recall the Petitioner requesting he strike the jurors and the Petitioner only "thought" he requested such a strike; he did not specifically remember doing so. We conclude the evidence does not preponderate against the post-conviction court's finding that the Petitioner did not show that Counsel rendered ineffective assistance when he did not challenge these two potential jurors during voir dire. Further, the Petitioner did not prove prejudice from these jurors serving on the jury panel at his trial. The Petitioner is not entitled to relief on this issue.

### B. Failure to File a Motion for a Change of Venue

The Petitioner claims that Counsel was ineffective when he failed to file a pretrial motion to change venue at the Petitioner's request. Venue may be changed if it appears to the court that, due to undue excitement against the defendant in the county where the offense was committed or any other cause, a fair trial is unlikely. Tenn. R. Crim. P. 21(a). The ultimate test is whether the jurors who actually sat and rendered verdicts were prejudiced by the pretrial publicity. *State v. Garland*, 617 S.W.2d 176, 187 (Tenn. Crim. App. 1981).

In this case, the post-conviction court found that the Petitioner did not present any proof of "undue excitement" in the community such that a fair trial would be impossible. Counsel testified that there was not any pre-trial publicity of this case and that during voir dire, the potential jurors were unaware of the Petitioner's case, thus Counsel did not have a good faith basis to file a motion for change of venue. The Petitioner does not assert that there was pre-trial publicity, rather he contends that venue should have been changed based upon public perception of the Hare Krishna community in which he lived. Other than his own statement that there was animosity toward the Hare Krishna community, the Petitioner did not provide any evidence to support that "undue excitement" existed and deprived him of a fair trial. Thus, we conclude the evidence does not preponderate against the post-conviction court's finding that "undue excitement" did not exist in the community such that the Petitioner could not receive a fair trial. *See Black*, 794 S.W.2d at 755. Moreover, the evidence does not preponderate against the post-conviction court's finding, based upon the testimony of the Petitioner and Counsel at the post-conviction hearing, that the Petitioner failed to demonstrate any prejudice resulting from trial counsel's failure to move for a change of venue. The Petitioner is not entitled to relief on this issue.

### C. Failure to Move for Mistrial

The Petitioner next argues that Counsel failed to object when a police officer made a sexual hand gesture to the jury during the victim's testimony. The post-conviction court found that Counsel was not aware of such a gesture being made, and the post-conviction court, which also presided over the Petitioner's trial, noted that it likewise did not see any such gesture.

Upon review of the record, we conclude the evidence does not preponderate against the post-conviction court's findings. Counsel testified at the post-conviction hearing that neither he nor Co-counsel saw the officer make a gesture to any juror during the trial. Counsel also testified that he was not made aware of the alleged gesture but, if he had been, he would have requested a mistrial and further requested that the officer be held in contempt of court and placed in jail. The Petitioner "thought" he mentioned it but acknowledged that no one else in the courtroom saw such a gesture. Other than his statement that this event occurred, there is no evidence in the record to support the Petitioner's contention. He is not entitled to relief on this issue.

### D. Failure to Call the Petitioner's Girlfriend as a Witness

The Petitioner next contends that Counsel was ineffective because he did not have Ms. Bowers, the Petitioner's alibi witness, testify at trial. The Petitioner argues that, because Ms. Bowers was with the Petitioner all night, she could have testified that he was not at the victim's home. As to this issue, the post-conviction court found:

> The [Petitioner] said himself . . . that the lack of evidence was probably their best defense, and that goes, I guess to the decision not to call the alibi witness, which would be a decision the Court would agree with.

> Oftentimes, alibi witnesses backfire on the defendant. It appears that this witness would not have actually supplied an alibi in that she–I accredit [Counsel's] testimony that she said she was passed out and could not account for [the Petitioner's] whereabouts the entire period of time that evening.

> In fact, [her testimony] would corroborate the evidence of the State, that both of them had been drinking and had been out away from home during the time period in question. So it was a strategic decision not to call her.

Indeed, the record supports the post-conviction court's findings of fact. "When a [post-conviction] petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing." *Black*, 794 S.W.2d at 757. If he fails to do so, he generally fails to establish ineffective assistance of counsel. *Id*. The post-conviction court may not speculate "on the question of . . . what a witness's testimony might have been if introduced" at trial. *Id*.;

*see also Wade v. State*, 914 S.W.2d 97, 102 (Tenn. Crim. App. 1995).  The Petitioner failed to present at the post-conviction hearing Ms. Bowers' testimony.  Moreover, Counsel possessed and reviewed Ms. Bowers's statement, indicating she was not conscious for the duration of the evening, and confirmed its contents with Ms. Bowers.  Counsel made an informed, strategic decision not to call Ms. Bowers as a witness and discussed this decision with the Petitioner.  We agree with the post-conviction court's findings that the Petitioner failed to establish by clear and convincing evidence that Counsel's representation fell below the standards of competent representation.  The Petitioner is not entitled to relief as to this issue.

## E. Cross-Examination of Sheriff Logan

On appeal, the Petitioner claims Sheriff Logan had a "personal vendetta" against him, and Counsel, thus, was ineffective for not raising this issue before the jury at trial.  The post-conviction court made no factual findings regarding this issue; however, our review of the record reveals that the Petitioner has not proven by clear and convincing evidence that Sheriff Logan had a personal vendetta against the Petitioner.

Other than Petitioner's vague assertion during the post-conviction hearing that, while in jail, he had a conversation with Sheriff Logan that the Petitioner considered a "conflict" and that Sheriff Logan knew his sister, the record is void of any evidence supporting Petitioner's contention. These facts do not demonstrate by clear and convincing evidence that Sheriff Logan had a "personal vendetta" against the Petitioner. *See* T.C.A. § 40-30-110(f).  Further, it does not demonstrate that, "but for" Counsel's allegedly ineffective cross-examination of Logan, the outcome of the trial would have been different.  *See Strickland,* 466 U.S. at 694; *Nichols*, 90 S.W.3d at 587.  Thus, we conclude  Counsel's performance was not deficient in this respect.  The Petitioner is not entitled to relief on this issue.

## F. Failure to Object to Photograph of Victim's Window

At trial, a photograph of a window at the victim's home was shown to the jury.  The photograph showed a screen removed from the window and a ladder beneath the window.  The Petitioner contends that Counsel erred in not objecting to this photograph because its implication that the Petitioner entered through the window was misleading to the jury.  The post-conviction court found:

> The photograph, as I recall, showed the screen off the window and a ladder there.  And the proof was that there was a screen on the window and probably no ladder beneath it at the time of the crime.
>
> It was fully explained.  The jury was not misled into thinking that it was a photograph of the way that window appeared at the time the crime was

committed.

Counsel testified that a police officer testified before the jury that he both removed the screen and placed the ladder beneath the window. Counsel acknowledged that he did not object to this photograph and had no intention of objecting to the photograph, explaining that it supported the defense theory that the Petitioner could not have entered the window as the State claimed. This photograph displayed the narrow measures of the screen as well as the distance from the window to the ground, both of which supported the defense's position that this window was too high and too small for the Petitioner to use to enter the victim's house. Whereas, a photograph depicting a screen removed and a ladder beneath the window could be misleading, Counsel found the photograph more valuable than misleading in this case, as a tool to dispel the State's theory. Further, through cross-examination of the police officer, Counsel made the jury aware that the photograph did not accurately depict the crime scene upon arrival by the police.

We conclude that the Petitioner has not met his burden of proving by clear and convincing evidence that Counsel was ineffective for failing to object to a photograph that dispelled the State's theory of entry. The Petitioner is not entitled to relief on this issue.

### G. Failure to Question Victim About Previous False Allegations

The Petitioner claims that Counsel was ineffective for failing to attack the victim's credibility at trial with evidence of prior false claims of sexual assault. The post-conviction court found that Counsel adequately investigated the allegations.

Counsel described the information he received that the victim made prior false claims of sexual abuse as "rumors." He attempted to confirm this information through multiple sources but was unable to do so. Because he was unable to confirm the information, he had no basis to attack the victim's credibility based upon the allegations. Thus, Counsel could not raise the issue of these allegations at trial.

We cannot conclude that the Petitioner has shown by clear and convincing evidence that Counsel was ineffective in his cross-examination of the victim at trial. The evidence supporting any previous allegations made by the victim were "rumors" and would not have been admissible. Counsel's failure to pursue this line of cross-examination was not ineffective. The Petitioner is not entitled to relief.

### III. Conclusion

After a thorough review of the record and relevant authorities, we conclude that the post-conviction court properly denied the Petitioner's petition for post-conviction relief. Accordingly, we affirm the judgment of the post-conviction court.

_____

ROBERT W. WEDEMEYER, JUDGE